2015 ND 216

**Robert HALE, d/b/a Bullwinkle Builders, Inc., Appellant**

v.

**CITY OF MINOT, Appellee.**

**No. 20140337.**

Supreme Court of North Dakota.

Aug. 25, 2015.

Lynn M. Boughey, Bismarck, ND, for appellant.

Kelly E. Hendershot, City Attorney, Minot, ND, for appellee.

KAPSNER, Justice.

[¶ 1] Robert Hale, doing business as Bullwinkle Builders, Inc., ("Hale") appeals from a district court order affirming a City of Minot Board of Appeals ("Board") decision affirming the denial of Hale's application for a building permit. We conclude that the Board did not act arbitrarily, capriciously, or unreasonably in affirming a City building official's decision to deny the application and that substantial evidence supports the Board's decision. We affirm.

I

[¶ 2] Hale operates a facility within the City of Minot known as Somerset Court, originally built in the late 1990s or 2000. In September 2013, Hale applied to the City for a building permit for the "construction of a 3 story addition to an existing assisted living facility–70 units" for an addition to the Somerset Court building. The permit application indicated a use group of "I–1" and a building use of "commercial/industrial." Hale asserts he filed the application with an "I–1" classification under protest so foundation and other preliminary work could begin.

[¶ 3] In December 2013, after a series of conversations and exchanges of information between the City's building official and Hale and his representatives, the building official denied the permit application for failure to submit certain required documentation. At issue is the building official's determination under the 2009 International Building Code ("IBC"), as adopted by the City, that Hale's facility is an "assisted living facility" classified as Institutional Group I–1, rather than an apartment building classified as Residential Group R–2. An applicant for a Institutional Group I–1 building permit is required to submit additional documentation prepared by a registered design professional and must install more expensive wiring.

[¶ 4] Hale appealed the building official's denial to the Board of Appeals. After a hearing, the Board issued a written decision concluding the building official had properly classified the proposed project; properly requested drawings prepared and certified by a qualified, licensed design professional; properly requested a code study; and properly denied modifications with respect to the proposed project. The Board unanimously affirmed the building official's denial of Hale's application, and the district court affirmed the Board's decision.

II

[¶ 5] This Court's standard of review for a decision of a local governing body is limited and deferential:

When considering an appeal from the decision of a local governing body under N.D.C.C. 28–34–01, our scope of review is the same as the district court's and is very limited. This Court's function is to independently determine the propriety of the [Board's] decision without giving special deference to the district court

decision. The [Board's] decision must be affirmed unless the local body acted arbitrarily, capriciously, or unreasonably, or there is not substantial evidence supporting the decision. A decision is not arbitrary, capricious, or unreasonable if the exercise of discretion is the product of a rational mental process by which the facts and the law relied upon are considered together for the purpose of achieving a reasoned and reasonable interpretation.

*Dahm v. Stark Cty. Bd. of Cty. Comm'rs,* 2013 ND 241, ¶ 8, 841 N.W.2d 416 (quoting *Grand Forks Hous. Auths. v. Grand Forks Bd. of Cty. Comm'rs,* 2010 ND 245, ¶ 6, 793 N.W.2d 168 (internal citations omitted)). "Such a standard of review ensures that the court does not substitute its judgment for that of the local governing body which initially made the decision." *Hector v. City of Fargo,* 2009 ND 14, ¶ 9, 760 N.W.2d 108. Generally, "the record is adequate to support the findings and conclusions of the city if it allows [the Court] to discern the rationale for the decision." *Id.* Further, while the interpretation of an ordinance presents a question of law, fully reviewable on appeal, this Court gives deference to a governing body's reasonable interpretation of its own ordinance. *See Dakota Res. Council v. Stark Cty. Bd. of Cty. Comm'rs,* 2012 ND 114, ¶ 16, 817 N.W.2d 373.

### III

[¶ 6] Hale essentially argues that the Board acted arbitrarily, capriciously, and unreasonably in affirming the building official's classification of Hale's facility and denial of a building permit because the evidence does not support the Board's decision.

[¶ 7] Under City of Minot Code of Ordinances ("Minot Code") §§ 9–1 and 9–2, the City adopted and incorporated into its ordinances the 2009 edition of the IBC with certain specified amendments. Under IBC § 104.1 (2009), the City's building official is authorized and directed to enforce and interpret the building code in compliance with the code's intent and purpose. Under IBC § 113.1, as amended by Minot Code § 9–2, an interested person adversely affected by a decision of the building official with respect to a technical issue may appeal to the Board of Appeals. The Board has "the right to affirm, reverse or modify the decision or order of the building official in question." IBC § 113.5, as amended by Minot Code § 9–2.

### A

[¶ 8] Hale argues the City building official misapprehended the true intent and proper interpretation of IBC §§ 308.2 and 310.2 (2009). He contends the building official and the Board misconstrued those provisions and incorrectly classified the expansion of the Somerset facility as Institutional Group I–1, instead of Residential Group R–2.

[¶ 9] Section 308.1, IBC (2009), provides for an "Institutional Group I" classification of buildings and structures that includes the Group I–1 designation:

Institutional Group I occupancy includes, among others, the use of a building or structure, or a portion thereof, *in which people are cared for or live in a supervised environment,* having physical limitations because of health or age are harbored for medical treatment or other care or treatment, or in which people are detained for penal or correctional purposes or in which the liberty of the occupants is restricted. Institutional occupancies shall be classified as Group I–1, I–2, I–3 or I–4.

(Emphasis added.) Section 308.2, IBC (2009), provides what the "Group I–1" classification includes, stating in part:

This occupancy shall include buildings, structures or parts thereof housing more than 16 persons, on a 24–hour basis, *who because of age,* mental disability or other reasons, live *in a supervised residential environment that provides personal care services.* The occupants are capable of responding to an emergency situation without physical assistance from staff. This group shall include, but not be limited to, the following:

> Alcohol and drug centers
>
> *Assisted living facilities*
>
> Congregate care facilities
>
> Convalescent facilities
>
> Group homes
>
> Halfway houses
>
> Residential board and care facilities
>
> Social rehabilitation facilities

(Emphasis added.)

[¶ 10] Under IBC § 310.2 (2009), "personal care service" means: "The care of residents who do not require chronic or convalescent medical or nursing care. Personal care involves responsibility for the safety of the resident while inside the building." The phrase "residential care/assisted living facilities" is defined as:

> A building or part thereof housing persons, on a 24–hour basis, who because of age, mental disability or other reasons, *live in a supervised residential environment which provides personal care services.* The occupants are capable of responding to an emergency situation without physical assistance from staff. This classification shall include, but not be limited to, the following: residential board and care facilities, assisted living facilities, halfway houses, group homes, congregate care facilities, social rehabili-

tation facilities, alcohol and drug abuse centers and convalescent facilities.

*Id.* (emphasis added).

[¶ 11] In contrast to the Group I–1 classification, Hale contends the expansion of the Somerset facility, originally designated R–2 when constructed under a former building code, should be classified as Residential Group R–2 under IBC § 310.1 (2009). "Residential Group R" includes the use of a building or structure for sleeping purposes "when not classified as an Institutional Group I." IBC § 310.1 (2009). Group R–2 means "[r]esidential occupancies containing sleeping units or more than two dwelling units where the occupants are primarily permanent in nature" and includes apartment houses, boarding houses (nontransient), convents, dormitories, fraternities and sororities, hotels (nontransient), live/work units, monasteries, motels (nontransient), and vacation timeshare properties. *Id.*

[¶ 12] Hale argues the building official and Board misinterpreted IBC § 308.2 (2009) and incorrectly concluded that Somerset is a facility that is a "supervised residential environment that provides personal care services," rather than an "independent" residential facility. At its core, Hale's argument asserts the determinative factor is whether the residents of the facility are "supervised." Hale contends section 308.2 does not apply because the residents of Somerset are not "supervised." He asserts the evidence shows that Somerset residents are tenants, that Somerset does not supervise the tenants, and that there are two types of assisted living facilities regarding the care provided—supervised and independent—of which Somerset is the latter.

[¶ 13] Hale also argues Somerset residents do not receive "personal care services." He contends the "few" services provided by Somerset, such as distribution

of medication assistance, meals at its in-house restaurant, a 24–hour emergency call system, and a transportation system, are not commensurate with an "assisted living facility" defined under North Dakota law or contemplated under IBC § 310.2. He contends the Somerset facility is not any of the facilities listed in IBC § 310.2, i.e., residential board and care facilities, assisted living facilities, halfway houses, group homes, congregate care facilities, social rehabilitation facilities, alcohol and drug abuse centers, and convalescent facilities.

[¶ 14] Hale argues the expansion of the existing facility should be considered an "apartment complex" for retired people who remain independent, mobile, and receive very few services. Although Hale concedes Somerset is licensed under state law as an "assisted living facility," he asserts this licensing is for purposes of residents employing and qualifying for long-term care insurance policies when they need "temporary assistance." Additionally, while the proposed building refers to a "medical room," Hale asserts this room is merely for medication storage and no "medical services" are provided at the facility.

[¶ 15] The City contends, however, the Board was not arbitrary, capricious, or unreasonable in reaching its decision. The City asserts IBC § 308.2 (2009) specifically provides a Group I–1 classification is for a building or structure that houses more than 16 people on a 24–hour basis and whose residents, because of age or other reasons, live in a "supervised residential environment" that provides personal care services. The City further contends the definitions of "personal care services" and "assisted living facilities" do not require chronic or invalid status and care. The City asserts "personal care services" under IBC § 310.2 means the care of residents who do not require chronic or convalescent medical or nursing care, but involves responsibility for the safety of the residents while inside the building.

[¶ 16] Section 102.2, IBC (2009), states that "[t]he provisions of this code shall not be deemed to nullify any provisions of local, state or federal law." As such, the City notes that state statutes and regulations also provide definitions for what is considered an "assisted living facility." Specifically, N.D.C.C. 23–09–01(1), states in part:

"Assisted living facility" means a building or structure containing a series of at least five living units operated as one entity to provide services for five or more individuals who are not related by blood, marriage, or guardianship to the owner or manager of the entity and which is kept, used, maintained, advertised, or held out to the public as a place that provides or coordinates individualized support services to accommodate the individual's needs and abilities to maintain as much independence as possible. An assisted living facility in this chapter includes a facility that is defined as an assisted living facility in any other part of the code.

*See also* N.D. Admin. Code ch. 75–03–34 (governing North Dakota Department of Human Services licensing of assisted living facilities); N.D. Admin. Code § 75–03–34–01 (defining "assisted living facility," "individualized support services," and "medication management").

[¶ 17] In its decision, the Board stated that it considered the testimony and documentation submitted at the hearing, and the Board unanimously agreed "the proposed addition to Somerset Court should be classified as Institutional Group I–1 occupancy per section 308.2." The Board stated that the 2009 IBC specifically identifies "assisted living facilities" as Institu-

tional, that the existing Somerset facility and new addition will be licensed as an "assisted living facility," that numerous existing services will be made available to "care for" individual tenants as needed or requested, and that building amenities "seem to exceed" those in a typical apartment complex.

[¶ 18] There was evidence presented at the Board's hearing that Somerset Court's purpose was to provide housing for older people in the community, that Somerset offers services and charges rent beyond that of a typical apartment complex, that the building permit application noted the addition was to an existing "assisted living facility," and that Hale accepted the foundation permit with a Group I–1 code classification. There was also evidence in the record that Somerset had applied to be licensed and has been licensed in North Dakota as an "assisted living facility" and that the Somerset facility held itself out to the public as an "assisted living facility" in a telephone book advertisement referencing its website.

[¶ 19] Based on our review, we conclude the record is adequate to support the Board's findings and conclusions and allows this Court to discern the rationale for its decision. Under our limited and deferential standard of review, we conclude the Board did not act arbitrarily, capriciously, or unreasonably in affirming the building official's classification of Hale's facility and in denying the building permit, and we conclude substantial evidence supports its decision.

B

[¶ 20] Hale argues the City building official misapprehended the intent and application of N.D.C.C. 43–03–02 and 43–03–22, regarding the "sufficiency" of the documentation submitted by him.

[¶ 21] Generally, N.D.C.C. ch. 43–03 governs the registration of architects, and N.D.C.C. 43–03–01(5) defines the "[p]ractice of architecture," which "includes the making of architectural plans and specifications for buildings." Section 43–03–02(1), N.D.C.C., provides, however, that the architect registration provisions of N.D.C.C. ch. 43–03 do not apply to:

b. A person preparing plans and specifications or designing, planning, or administering the construction contracts for the construction, alteration, remodeling, or repair of:

. . . .

(2) A building that under applicable building code does not *exceed two stories* in height exclusive of a one-story basement, and is:

. . . .

(b) A building not considered to have a primary building code occupancy classification of assembly group A–1, educational group E, high-hazard group H, *or institutional group I;*

. . . .

(3) Rental apartment units that do not exceed three stories in height exclusive of a one-story basement;

. . . .

(Emphasis added.) Section 43–03–22, N.D.C.C., provides that when an architect's certification of registration is issued, "the certificate holder" must "acquire . . . a stamp or indicia to be used by the certificate holder in the conduct of the certificate holder's practice and to be impressed upon drawings, plans, and other documents prepared by the certificate holder."

[¶ 22] Section 107.1, IBC (2009), states that the "construction documents shall be prepared by a registered design professional where required by the statutes of the jurisdiction in which the project is to

be constructed" and that "[w]here special conditions exist," the building official may require additional construction documents be prepared by a registered design professional. *See also* IBC § 107.2.1 (2009) ("Construction documents shall be of sufficient clarity to indicate the location, nature and extent of the work proposed and show in detail that it will conform to the provisions of this code and relevant laws, ordinances, rules and regulations, as determined by the building official."); IBC § 107.3 (2009) ("The building official shall examine or cause to be examined the accompanying submittal documents and shall ascertain by such examinations whether the construction indicated and described is in accordance with the requirements of this code and other pertinent laws or ordinances."). As one noted treatise has explained:

It is frequently required that an application for a building permit be accompanied by plans and specifications, and by maps or plats, to be approved by designated officials, and sufficiently detailed in content to enable officials to ascertain whether the contemplated construction will comply with pertinent regulations and laws. *A municipality may require that all plans and specifications be prepared by a registered architect or engineer,* and it may prohibit under penalty substantial deviations from the plans and specifications.

9A Eugene McQuillin, *The Law of Municipal Corporations* § 26:227 (3d ed. rev. 2007) (emphasis added). "Failure of an applicant to file plans and specifications as required by ordinance renders the application fatally defective and precludes issuance of a permit by a writ of mandamus." *Id.*

[¶ 23] Here, part of the building official's rationale for denying the application was on grounds of "[l]ack of properly prepared documents" under N.D.C.C. 43–03–02 and 43–03–22 and "[n]o submitted code study for the proposed construction" because specified plans and a code study needed to be prepared by a registered design professional. The Board found Hale had initially submitted uncertified architectural drawings, prepared by an unlicensed designer, to the building official in September 2013 for a preliminary code review. The Board also found that in November 2013 Hale had an architect become involved in the project, who submitted a letter stating the building plans meet the requirements of the 2009 IBC. The architect stated at the hearing, however, that while he did not believe the drawings were inadequate or incorrect, he would not "stamp" the drawings because he did not draw them and it is "against state law for an architect to stamp somebody else's drawings." In denying the permit, the building official essentially required Hale to submit redrawn plans and documentation prepared by a registered design professional.

[¶ 24] In its decision affirming the building official, the Board found that the building official had authority to require all drawings be prepared under the direct supervision, control, and certification of a qualified, licensed design professional. The Board reasoned that this "assisted living facility" was properly classified as Institutional Group I–1, that the building exceeded two stories, and that N.D.C.C. 43–03–02(1)(b)(2)(b) requires all drawings be prepared and certified by a qualified, licensed design professional.

[¶ 25] Regarding the building official's decision requiring Hale to submit a code study, the Board found that the architectural plans provided to the Board did not "meet the requirements of the 2009 IBC or NDCC." The Board found that although there were "no written instructions" for a

code study, a "licensed design professional is versed in preparing a code study," and "[a] code study is typically summarized on the cover sheet of the construction drawings by the design professional." The Board concluded the building official had the right to require and the owner has an obligation to provide construction documents "that meet the requirements of [the] 2009 IBC and NDCC." Despite Hale's claims that the building official had already conducted a code study, the Board reasoned that the building official's purpose is "to provide a plan review for building code compliance.... not to replace services of a license[d] design professional required by the adopted building code."

[¶ 26] Hale contends the Board and building official misapplied N.D.C.C. 43–03–02(1)(b)(2)(b) when concluding the facility is properly classified as Institutional Group I–1. He argues the architect provisions of N.D.C.C. ch. 43–03 do not apply to this construction project because N.D.C.C. 43–03–02(1)(b)(3) applies, exempting "[r]ental apartment units that do not exceed three stories." However, even if not exempted under this provision, Hale asserts the documents were properly prepared by a design professional under the direction and supervision of an architect and were properly certified by an architect. He asserts the requirement for the architect to physically prepare the documents makes no sense and was arbitrary and capricious. He also asserts the City admits it has no written administrative guidelines or industry standard for requirements for a code study, and the information supplied by Hale is sufficient and complied with the purpose of the code.

[¶ 27] However, as the City asserts, no evidence was presented to the Board that the submitted plans were drawn by a registered architect or that the submitted plans were impressed with the stamp or appropriate indications by a lawful certificate holder. The Board decided the building official correctly determined the submitted documents were insufficient. We conclude Hale's argument regarding the sufficiency of his submitted documentation is primarily controlled by the classification of the facility as Group I–1, and thus the facility does not fall within an exemption relating to the necessary architectural plans and documents.

[¶ 28] Based on our review, we conclude the record is adequate to support the Board's findings and conclusions and permits this Court to discern the rationale for its decision. We conclude the Board did not act arbitrarily, capriciously, or unreasonably and substantial evidence supports its decision about the lack of documentation.

### C

[¶ 29] Hale also argues that the Board should have allowed a modification under IBC § 104.10 (2009) and should have allowed alternate materials or methods of construction under IBC § 104.11 (2009).

[¶ 30] Hale asserts the Minot Code specifically allows the Board to apply IBC §§ 104.10 and 104.11 (2009). See Minot Code § 9–2, amending IBC § 113 to add section 113.1.1(2) ("Whether a modification ought to be granted pursuant to Subsection 104.10 of this code[.]"), and (3) ("Whether alternate materials or methods of construction ought to be allowed under 104.11."), and section 113.5 ("The body hearing the appeal shall have the right to affirm, reverse or modify the decision or order of the building official in question."). Section 104.10, IBC (2009), addresses "modifications," and states:

Wherever there are practical difficulties involved in carrying out the provisions of this code, the building official shall have

the authority to grant modifications for individual cases, upon application of the owner or owner's representative, provided the building official shall first find that *special individual reason makes the strict letter of this code impractical and the modification is in compliance with the intent and purpose of this code and that such modification does not lessen health, accessibility, life and fire safety, or structural requirements.* The details of action granting modifications shall be recorded and entered in the files of the department of building safety.

(Emphasis added.) Section 104.11, IBC (2009), addresses "alternative materials, design and methods of construction and equipment," and states:

The provisions of this code are not intended to prevent the installation of any material or to prohibit any design or method of construction not specifically prescribed by this code, provided that any such alternative has been approved. An alternative material, design or method of construction shall be approved where the building official finds that *the proposed design is satisfactory and complies with the intent of the provisions of this code, and that the material, method or work offered is, for the purpose intended, at least the equivalent of that prescribed in this code in quality, strength, effectiveness, fire resistance, durability and safety.*

(Emphasis added.)

[¶ 31] Hale argues the Board refused to allow a modification or alternate material for electrical wiring, even though the romex cable type of wiring proposed by Hale as an alternative to conduit would be approved in the near future, and his "designers have demonstrated that the safety concerns of using romex impair no safety in any manner and are alleviated by the type of fire suppression system that Mr. Hale is employing." He asserts that requiring the facility to "be wired entirely with conduit or MC Cable rather than romex cable" would impose an additional cost of between $250,000 and $350,000. Hale asserts the Board was asked to approve "allow[ing] the type of wiring used in an R–2 building instead of [that required in] an Institutional building" as either a modification under IBC § 104.10, or as an alternate material, design or method of construction under IBC § 104.11, and the Board erred in not doing so.

[¶ 32] The City responds that requests for modifications or alternate materials cannot be driven by the desire to save money or construction costs, but rather must be evaluated in the IBC's purpose in safeguarding public health, safety, and general welfare of residents. The City contends Hale made no evidentiary showing the requirements for a Group I–1 facility were "impractical" with respect to the expansion project or that the use of alternative materials and design are satisfactory and comply with the IBC's safety intent. The City also asserts that, although Hale now focuses on the wiring requirements for an I–1 facility, his prior requests for modification were far broader, and the Board's decision was in response to his broader request. The City contends that Hale's permit would still have been denied even if he had requested a modification solely in regard to the wiring requirement and that the Board cannot waive the requirements of the IBC.

[¶ 33] The Board found it was not asked to rule on any "specific" modifications and was not asked to rule on any "specific" alternatives. In addressing modification, the Board found "the 2009 IBC provisions satisfy all requirements for Group I–1." Further, in addressing alternative materials, design and methods of

880

construction, the Board found that such alternatives could be approved or denied "based on the results determined by research reports from approved agencies or by tests performed by an approved agency." The Board then cited IBC §§ 104.11.1 (addressing "Research Reports"), and 104.11.2 (addressing "Tests").

[¶ 34] Hale asserts he specifically requested the Board to consider Group "R–2 wiring" for the facility classified as Group I–1. However, there does not appear to have been evidence submitted at the hearing, e.g., research reports or tests, regarding the specific different types of wiring appropriate for Group R–2 facilities and Group I–1 facilities. Such evidence could have established, for purposes of IBC § 104.10 (2009), that "such modification does not lessen health, accessibility, life and fire safety, or structural requirements" or, for purposes of IBC § 104.11 (2009), that the alternate R–2 wiring is "at least the equivalent of that prescribed in this code in quality, strength, effectiveness, fire resistance, durability and safety." While there were discussions regarding fire safety of the facility and that the type of wiring proposed would be "approved" for such a facility in the future, based on this record we cannot conclude that Hale established either the Board or building

official was incorrect in classifying the Somerset facility as Group I–1 or that Hale established any right to either a modification or alternative material to allow "R–2 wiring" under the relevant building code provisions.

[¶ 35] We conclude the Board's decision to affirm the building official was not arbitrary, capricious, or unreasonable.

IV

[¶ 36] Hale's remaining arguments are either without merit or unnecessary to our decision. We conclude the Board did not act arbitrarily, capriciously, or unreasonably in classifying Hale's facility and denying the building permit and substantial evidence supports the Board's decision. The district court order is affirmed.

[¶ 37] GERALD W. VANDE WALLE, C.J., LISA FAIR McEVERS, DANIEL J. CROTHERS and DALE V. SANDSTROM, JJ., concur.